JUSTICE TRIEWEILER
dissenting.
I dissent from the majority opinion.
By affirming the Workers’ Compensation Court, the majority has placed an impossible burden on injured workers who wish to restore some of their lost earning capacity by availing themselves of the rehabilitation benefits provided for in the Workers’ Compensation Act.
Joan Reeves proved that her earning capacity had been substantially reduced due to a job-related disability; her earning capacity could be substantially improved by furthering her education; and she was qualified by intellect, training, and disposition for the program in which she sought to enroll. These facts are uncontroverted and are sufficient to satisfy the requirements of § 39-71-2001, MCA (1993).
Instead of applying the simple terms of the rehabilitation statute, the Workers’ Compensation Court, and the majority of this Court, have required that before completing a two-year graduate program, the claimant know exactly what kind of counseling she is going to do, what kind of market there is for that counseling, and how she would overcome professional obstacles that she is not even in a position to anticipate. What the court has done is no different than concluding that it is unreasonable for someone to enter law school unless they first know what their specialized area of practice is going to be, how many other people are currently engaged in that specialized area, and what their marketing strategy is going to be for competing with already established lawyers. Most lawyers would agree that applying these same requirements to their own profession would be absurd. Applying these requirements to Joan Reeves is no less absurd.
The uncontroverted evidence established the following:
Joan Reeves has a bachelor’s degree in home economics with a family science option. The family science option was recommended for students intending to obtain a master’s degree in family counseling. She satisfied the requirements for a family science option because it was always her intention to obtain a master’s degree and become a family counselor.
*163 Joan maintained a “B” average in high school and a “B+” average in college. Everyone concedes that she is academically and intellectually qualified to enter and successfully complete a master’s degree program which would qualify her to become a licensed practical counselor providing marriage and family therapy.
After her graduation from MSU in June 1991, before entering a master’s program, she first went to work to pay off debts that she had accumulated during college and to save money for her graduate education. At the time, entry level jobs for which she would have qualified with her college degree paid from $7.00 to $8.00 per hour. However, by doing physical labor for her father she was able to earn $10.00 an hour. She later earned $11.00 an hour as her starting wage for UPS. At the time of her injury she was earning $12.82 an hour as a package car driver. Evidence at the trial was that after two years on the job her wage would have increased to $18.84 an hour.
On January 4,1994, while working for UPS, Joan sustained a back injury. As a result of her injury she cannot return to her job. She has been unable to find employment related to her education and instead does telemarketing and other part-time work for the Bozeman Chronicle. Her average hourly wage, including commissions, is $9.81 an hour.
She explained that her interest in obtaining a master’s degree was based on two factors. First, she stated that she could not otherwise qualify for the specific type of counseling that she was interested in. Second, she testified that counselors with a master’s degree earn substantially more than counselors with a bachelor’s degree.
Reeves was not, as the Workers’ Compensation Court found, unrealistically selective about the kind of work she wanted to do as a counselor. Following cross-examination by the Workers’ Compensation Court Judge, she tried to provide the following explanation for preferring private practice to agency work:
THE COURT: I understand the kind of people that you want to counsel; but, in my mind immediately is are those the kind of people who are going to be coming to marriage counselors?
THE WITNESS: You made a comment earlier that, you know, that I assumed that there were just going to be husbands and wives without kids and stuff. I just wanted to clear that up. I mean I assume that husbands and wives are going to come in with kids who probably have drug problems or are acting out and those sort of things. I realize there are other types of situations.
*164 My clarification is that I think the difference being those people are coming to you for help. I mean they are not people who have been assigned to you by someone else. I mean those are people [who] actually want help.
In other words, Reeves’ innocent statement which has been blown out of proportion by the Workers’ Compensation Court was that given her choice she would rather counsel people in the private sector who are interested in solving their problems than people assigned to her at a government agency who are there simply because they have to comply with some court or agency directive.
The idea that this person who has not even enrolled in her master’s degree program should somehow be able to anticipate exactly who her clientele will be or how she will adapt her education to the realities of the market place is strange to begin with. Nevertheless, doing her best to respond to the trial judge’s concerns, she later explained during re-examination that in a worst case scenario if she could not successfully establish a private practice, but had a master’s degree, she could go to work for an agency earning more than she would earn with a bachelor’s degree and still eventually attempt to work into a private practice.
The testimony of Susan Kern, the rehabilitation counselor hired by Liberty Mutual, did nothing to dispel the obvious conclusion that Reeves’ vocational rehabilitation proposal was reasonable.
Kern agreed that Reeves’ earning capacity, without further education, was between $7.00 and $10.73 per hour, but that with a master’s degree her entry level wage for a mental health agency would be $12.30 per hour.
Kern agreed that Reeves was intellectually capable of completing the master’s program. She agreed that with some employers she would have a greater long-term earning capability with a master’s degree than with a bachelor’s degree, and she agreed that there were differences in the job descriptions for people with bachelor’s degrees, as opposed to master’s degrees. Most critically, Kern, who was retained and paid for by Liberty Mutual, gave the following testimony:
Q. I asked you in your deposition a question about whether you had enough information about Joan to form an opinion as to whether you thought her vocational goal of getting a master’s degree was a reasonable goal for her. What is your opinion in that regard?
A. I think it’s reasonable for her.
*165 Section 39-71-2001, MCA (1993), does not require the impossible. It simply requires that before a claimant qualifies for rehabilitation benefits he or she have a partial disability, be unable to return to the job at which the claimant was injured, and have a rehabilitation plan, including “reasonable vocational goals.” All of those requirements were satisfied in this case. To deny Reeves benefits because prior to even entering the graduate program she was not absolutely certain about the kind of clientele she would counsel, the feasibility of the type of counseling she thought she would prefer, or the marketing strategy she would employ to be successful, suggests a preoccupation on the part of the trial court with denial of claimant’s benefits, rather than an objective application of the statutory requirement.
Although the concurring opinion certainly does not have the force of precedent, I am also concerned about some of the views stated therein. I agree that pursuant to the requirements of § 39-71-2001, MCA (1993), the insurer has no right to dictate to the rehabilitation provider what plan is most suitable for a claimant. I also agree that the insurer has an obligation to act in good faith when it selects and designates the rehabilitation provider and when it charges the provider with its responsibility.
However, to assume, as the concurring opinion does, that insurers will not exert total and complete control, even if indirectly, over the rehabilitation providers which it retains at its expense, ignores reality.
Under the current statutory scheme there is little opportunity for, and no funding with which injured workers can consistently retain rehabilitation providers. Insurers and employers are the only parties who can consistently hire them. Any private rehabilitation provider currently operating in this state knows that it cannot long do business without a satisfied clientele of insurers. Therefore, if the only plans the Workers’ Compensation Court can consider are those submitted by the rehabilitation counselor hired by the insurer, no claimant will ever qualify for rehabilitation benefits and the statutory framework which encourages rehabilitation in exchange for a reduction in partial disability benefits would be rendered meaningless. If this Court is going to apply § 39-71-2001, MCA (1993), as narrowly as suggested by the concurring opinion, it might as well interpret the statute to mean “an injured worker is eligible for rehabilitation benefits if his or her insurer decides that it would like to pay an extra 104 weeks of benefits.”
*166 I would conclude that whenever an insurer, or the rehabilitation provider that it hires and pays for, arbitrarily and unreasonably refuses to consider rehabilitation for an injured worker, that worker must necessarily have the option of submitting his or her own rehabilitation plan to the Workers’ Compensation Court for consideration of whether it meets the statutory requirements of § 39-71-2001, MCA(1993). To hold otherwise would give the insurer complete and total control over the eligibility of injured workers for rehabilitation benefits.
Having made this observation, however, I would note that this issue was not before the Workers’ Compensation Court and is not before this Court because even the insurer concedes in its appellate brief that under the circumstances it would be unreasonable to argue that the court should not have considered claimant’s proposed rehabilitation plan. At page 18 of its brief the insurer states:
Additionally, Liberty does not claim rehabilitation benefits are inappropriate because no plan has been filed with the Department. It would be unreasonable for a carrier to defend on this basis when the lack of a rehabilitation plan results from the insurer having instructed the rehabilitation provider to perform an employability assessment and then, after the assessment reveals the claimant can return to work without retraining, authorizes only job placement services.
Joan Reeves proposed the most reasonable rehabilitation plan possible considering her age, education, training, work history, physical limitations, and vocational interests. It was wrong to frustrate her sincere and legitimate efforts to improve her vocational future based on the unreasonable and impossible demands of the trial court.
For these reasons I dissent from the majority opinion and disagree in part with the concurring opinion.
JUSTICE HUNT joins in the foregoing dissenting opinion.